UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

UNITED STATES OF AMERICA,

        - against -                **23-cr-395 (JGK)**

JONATHAN TORRES,              **MEMORANDUM OPINION
AND ORDER**

             Defendant.
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The defendant, Jonathan Torres, is charged in a seven-count superseding indictment.[1] The defendant now moves to suppress certain evidence related to these charges -- namely (1) narcotics and a firearm recovered from the defendant incident to his arrest on February 11, 2023, and (2) a driver's license, firearm, cell phone, and money recovered at the time of the defendant's arrest on June 15, 2023. ECF Nos. 32 and 48. The defendant argues that this evidence was obtained in violation of his constitutional rights. Id. The defendant also moves to sever Counts One and Two from the remaining counts. ECF No. 49.

On February 26, 2024, the Court held an evidentiary hearing on the motion to suppress. The Government presented seven

---

[1] The seven counts are: Count One: distribution of narcotics in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C); Count Two: firearm use, carrying, and possession in violation of 18 U.S.C. § 924(c)(1)(A)(i); Count Three: carjacking in violation of 18 U.S.C. §§ 2119 and 2; Count Four: Hobbs Act Robbery in violation of 18 U.S.C. §§ 1951 and 2; Count Five: firearm use, carrying, and possession in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii), and 2; Count Six: wire fraud in violation of 18 U.S.C. §§ 1343 and 2; and Count Seven: aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2. See Superseding Indictment, ECF No. 36.

witnesses: New York City Police Department ("NYPD") Officers Brett Malfetano, Ryan Hennessy, and Zakaria Hijazi, Homeland Security Investigations ("HSI") Special Agent Kyle Tallio, NYPD Sergeant James Burke, and NYPD Detectives Gabriel Echevarria and Nicholas Geroulakis. The defense presented one witness -- Sardis Estevez, the defendant's mother.

Based on all of the evidence, and having assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law.

**I.**

**A. October 2022**

On October 13, 2022, a livery cab driver reported that his taxi had been stolen. See Def.'s First Mot. to Supp., Ex. B, ECF No. 32-3. The cab driver told police that he was hailed down by two individuals at East Tremont Avenue and Grand Concourse in the Bronx. See id. The two individuals asked for a ride to West 230th Street and Heath Avenue. See id. Upon arriving at the location, one of the individuals pointed a gun at the back of the cab driver's neck and demanded that the cab driver get out of the taxi. See id. The two individuals then drove away with the vehicle. See id.

On October 21, 2022, NYPD Officer John Joyce reportedly observed the cab driver's taxi in New York County, conducted a computer check of the license plate, and learned the vehicle had

2

been reported stolen. See id., Ex. C, ECF No. 32-4. Officer Joyce stopped the vehicle, which the defendant was reportedly driving. See id. The defendant allegedly provided a false New York State driver's license. See id. The defendant also had in his possession credit cards and checks in names other than his own. See id. Officer Joyce arrested the defendant. See id.

The defendant was arraigned the same day in New York County Criminal Court for grand larceny in the third degree for car theft and other related charges. See id., Ex. D, ECF No. 32-5. The case against the defendant in New York County was subsequently dismissed.

### B. February 11, 2023

On the evening of February 11, 2023, members of the NYPD's 40th Precinct "conditions" team were on patrol in the vicinity of East 137th Street and Brown Place in the Bronx. See February 26, 2024 Hr'g Tr. at 7-11, ECF No. 56 ("Tr."). The 40th Precinct is a "high-crime" precinct, and shootings, robberies, and narcotics-related activities have taken place in the area around East 137th Street and Brown Place. See id. at 10, 39, 70. The NYPD officers were in uniform and split between two identical unmarked NYPD vehicles. See id. at 8-9, 69. In the first vehicle, Officer Hijazi was driving, Officer Malfetano was in the front passenger seat, and Officer Cruz was in the backseat. See id. at 8, 69. In the second vehicle, located behind the

3

first vehicle, Officer Roveto was driving, Officer Hennessy was in the front passenger seat, and Sergeant Santos was in the backseat. See id. at 53.

While inside the first vehicle, Officer Malfetano observed an individual ("Individual-1") and the defendant traveling eastbound on 137th Street. See id. at 12, 24. Individual-1 wore a ski mask. See id. at 11. Officer Malfetano reported making eye contact with Individual-1, at which point Officer Malfetano observed Individual-1 and the defendant jaywalk across Brown Place away from the officers. See id. at 12-13. As Individual-1 and the defendant, who was in a wheelchair, continued traveling northbound on Brown Place away from the police vehicle, Officer Malfetano observed what appeared to be a weighted object consistent with the appearance of a firearm in Individual-1's right jacket pocket. See id. at 13-14. Officer Malfetano testified that, as the first police car turned onto Brown Place and approached Individual-1 and the defendant, Individual-1 began looking back towards the police car and walking unusually close to the brick wall on the east side of Brown Place, in what appeared to be an effort to shield the right side of Individual-1's body from the view of the car. See id. at 13-15; see also Gov't Ex. 101. As a result, Officer Malfetano got out of the police vehicle, approached Individual-1, and conducted a stop and frisk. See Tr. at 14-15.

4

As Officer Malfetano approached Individual-1, other NYPD officers approached to support Officer Malfetano's stop of Individual-1. As Officer Malfetano walked towards Individual-1, the defendant initially began to wheel away, namely southbound on Brown Place, towards Officers Hennessy and Roveto. See id. at 41, 54. However, when the defendant noticed Officers Hennessy and Roveto approaching northbound on Brown Place, rather than wheel directly past Officers Hennessy and Roveto, the defendant turned 180 degrees, rejoined Individual-1, and positioned himself so that his back was towards Officers Hennessy and Roveto. See id. at 41, 54-55; Gov't Ex. 102. Another officer, Officer Cruz, approached from the street, stood between the street and Individual-1 and the defendant, and shined a flashlight on Individual-1 and the defendant. See Tr. at 55-57.

Officer Hijazi, who was operating the NYPD vehicle that Officer Malfetano had been riding in, left his vehicle and observed Officer Malfetano's stop of Individual-1 from the street. See id. at 70-72. As Officer Malfetano interacted with Individual-1, Officer Hijazi observed the defendant react nervously to the presence of NYPD officers by first attempting to evade contact with Officer Malfetano by heading southbound towards 137th Street, then turning back around and going back towards Individual-1 after noticing Officer Hennessy. See id. at 72. Officer Hijazi further observed the defendant's nervous

demeanor and the fact that the defendant's eyes were widened. See id.

After patting down Individual-1 and finding no weapon, Officer Malfetano, as well as Officers Hennessy, Roveto, and Cruz, turned to walk away, and Individual-1 and the defendant also began to move away. See id. at 16, 42, 72. The encounter lasted approximately thirty seconds. See Gov't Ex. 101. At that moment, Officer Hijazi, who had walked onto the curb from the street, see Gov't Ex. 104, observed the defendant pick up the pace, and Officer Hijazi shined a flashlight at the front portion of the defendant's body. See Tr. at 73. Officer Hijazi reported seeing an L-shaped, weighted object inside the defendant's front hoodie pocket. See id. at 73-74. Officer Hijazi's body-worn camera footage plainly supports Officer Hijazi's testimony. See Gov't Ex. 104. As Officer Hijazi approached the defendant, Officer Hijazi testified that the defendant attempted to clutch the object from the outside in order to conceal it and to prevent Officer Hijazi from frisking that pocket. See Tr. at 74. Officer Hijazi proceeded to conduct a pat-down of the outside of the defendant's pocket, felt the trigger well of a firearm, and removed the firearm from the defendant's pocket. See id. The defendant did not say that he had a license for the firearm. The defendant later told Officer Hijazi "[I] should have shot [you]." See id. at 75.

The defendant was placed under arrest. See id. at 43. A search incident to arrest revealed that the defendant had an additional round of ammunition and a quantity of narcotics in his pocket. See id. at 44-46.

The defendant was arraigned after his arrest in Bronx County Supreme Court for criminal possession of a weapon in the second degree, criminal possession of a controlled substance in the seventh degree, and other related charges. See Def.'s First Mot. to Supp., Ex. F, ECF No. 32-7. The case against the defendant in Bronx County was later dismissed.

### C. June 15, 2023

On June 13, 2023, Magistrate Judge Ona T. Wang issued an arrest warrant for the defendant, ECF No. 2, based on a complaint and affidavit submitted by NYPD Detective Jared Tepperman, ECF No. 1. The complaint alleged that on February 11, 2023, the defendant possessed crack cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C), and possessed a firearm in furtherance of the narcotics offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i). See id.

On the morning of June 15, 2023, a team of law enforcement officers met at the local police precinct in the Bronx to discuss plans to arrest the defendant at his apartment at 300 East 138th Street, Apartment 4J, pursuant to the arrest warrant.

See Tr. at 96, 130-31. During the meeting, members of the team were shown a photograph of the defendant and a post from the defendant's social media account, which showed the defendant holding a firearm with a red laser. See id. at 96-98, 131; Gov't Ex. 211. Because of the defendant's social media post and the defendant's firearms-related charge in the arrest warrant, team members believed that a firearm might be present at the defendant's apartment. See Tr. at 131.

When the team arrived at the defendant's apartment, one of the team members, HSI Special Agent Kyle Tallio, was assigned to monitor the exterior of the apartment building. See id. at 98-99. Special Agent Tallio's role was to ensure that no one tried to conceal or dispose of evidence, including by throwing items out of the apartment's windows. See id. As Special Agent Tallio and NYPD Sergeant James Burke both testified, it is common practice to have law enforcement officers assigned to monitor the outside of a location where an arrest warrant or search warrant is being executed, due to concerns that targets can flee or attempt to hide or destroy evidence and contraband. See id. at 99, 132-33.

Special Agent Tallio identified the windows of the defendant's apartment from the exterior by locating the windows on the first floor of the building that were marked with a "J," and counting up to the fourth floor. See id. at 100-01; Gov't

8

Ex. 201-A. Special Agent Tallio saw a light on in one of the
rooms of the defendant's apartment and used his radio to notify
the other members of the team that were inside the defendant's
apartment building. See Tr. at 99, 102-04; Gov't Exs. 201-B,
201-C. A member of the law enforcement team acknowledged Special
Agent Tallio's message and replied that the team was either
knocking on the defendant's apartment door or had just arrived
at the door. See Tr. at 103. The officers who went inside the
defendant's apartment building knocked on the door of the
apartment. See id. at 133, 168. The defendant's mother answered
the door, and the officers entered the apartment. See id. at
133-34.

Just seconds after Special Agent Tallio radioed the team
about the light on in a room of the apartment, Special Agent
Tallio saw an arm with a green sleeve reach out of the window of
that room and place an object that looked like a firearm under
the air conditioning unit on the adjacent window ledge. See id.
at 104-06; Gov't Ex. 201-C. Special Agent Tallio testified that
he has been a special agent with HSI for six years and
previously worked for Customs and Border Protection ("CBP") for
five-and-a-half years. See Tr. at 92-93. Special Agent Tallio
has experience in recognizing and handling firearms from
carrying a firearm in the course of his eleven-year career in
law enforcement, and from the many searches and seizures of

9

firearms that he participated in with HSI and CBP. See id. at
94. During his career, Special Agent Tallio also received
firearms-related training from two law enforcement academies.
See id.

Special Agent Tallio testified that, at that moment, he
notified the team over the radio that he had seen an arm come
out of the window of the room with the light on and saw the arm
put something that looked like a firearm under the air
conditioning unit. See id. at 106, 118, 120, 125-26. Sergeant
Burke testified that, right before law enforcement went inside
the apartment or right as the apartment door opened, Special
Agent Tallio notified the team that someone wearing a green
shirt had placed an item outside by the air conditioning unit.
See id. at 134-35. Special Agent Tallio testified that he told
the other members of the team what he had seen because there
were safety concerns with having a firearm in an apartment where
law enforcement was executing an arrest warrant. See id. at 107.
Special Agent Tallio testified that having a firearm on an
outside window ledge also raised safety concerns for the public
because there was a risk that the firearm could fall off the
window ledge. See id.

As Sergeant Burke entered the apartment, he observed that
the floor and baseboards in the defendant's social media post,
see Gov't Ex. 211, matched the floor and baseboards of the

10

apartment. See Tr. at 131-32. He also saw the defendant sitting
in a wheelchair in the hallway and saw the defendant attempt to
hand a large amount of money to another occupant of the
apartment. See id. at 134, 157-58. A law enforcement officer
approached and seized the money. See id. The defendant's mother
also testified that an officer seized money from the defendant
as he was trying to hand the money to her. See id. at 185.

NYPD Detective and HSI Task Force Officer Gabriel
Echevarria testified that he was one of the last members of law
enforcement to enter the defendant's apartment after the
defendant's mother answered the door. See id. at 168. As
Detective Echevarria entered the apartment, he saw the defendant
in the hallway. See id. Detective Echevarria approached the
defendant and stood in between the defendant and two women who
were in the apartment. See id. at 168-69. The defendant asked
one of the women to take his phone, at which point Detective
Echevarria patted the defendant down and recovered the cell
phone. See id. at 169. The defendant's mother similarly
testified that an officer took the defendant's cell phone from
the defendant. See id. at 185. As Detective Echevarria
testified, it is NYPD practice to seize cell phones in
connection with the arrest of defendants. See id. at 169.
Detective Echevarria then gave the phone to Detective Tepperman,
and the defendant's cell phone was brought to NYPD's 10th

Precinct, where it was vouchered. See id. at 146, 170; Gov't Ex. 207.

As team members began to place the defendant under arrest, they also began to perform a protective sweep, going immediately into the bedroom that was only seven or eight feet away from the defendant, to follow up on Special Agent Tallio's radio transmission about the item that had been placed under the air conditioning unit. See Tr. at 135, 141, 157. The defendant's mother also testified that the officers went to the defendant's bedroom right after entering the apartment. See id. at 184. Based on his training and experience, including experience participating in arrests and searches where individuals threw contraband out of windows, Sergeant Burke believed that the item placed under the air conditioning unit was contraband. See id. at 135-36. Sergeant Burke similarly testified that the fact that an item had been placed under an air conditioning unit while law enforcement was executing an arrest warrant raised safety concerns, including a concern that if the item were a firearm, it would present safety risks for law enforcement officers inside the apartment as well as the public. See id.; Gov't Ex. 202.

When Sergeant Burke followed Detective Tepperman into the defendant's bedroom, he saw Detective Tepperman reach out of the window and recover a firearm. See Tr. at 137. Both Special Agent

Tallio and Sergeant Burke testified that the firearm was
recovered within one minute of law enforcement entering the
apartment. See id. at 107-08, 141. The firearm Detective
Tepperman recovered from the window ledge was a loaded black 9mm
Ruger with a laser, resembling the firearm from the defendant's
social media post. See id. at 139; Gov't Exs. 205, 211.

Immediately after recovering the firearm, Detective
Tepperman placed it on a desk that was adjacent to the window.
See Tr. at 137-38; Gov't Ex. 204. As Detective Tepperman placed
the firearm on the desk, Sergeant Burke saw that on the desk was
a Connecticut driver's license with a photograph of the
defendant bearing another individual's name. See Tr. at 141-42;
Gov't Exs. 206, 209; see also Tr. at 144. The driver's license
was thereafter brought to the police precinct and vouchered. See
Tr. at 146-47.

When Special Agent Tallio went inside the apartment to see
if the team needed any assistance, he saw a female wearing the
same green colored shirt that he had seen reach out the
apartment window. See id. at 108-110. During the hearing,
Special Agent Tallio identified a photograph of a female in the
green shirt as the female he saw in the apartment on June 15,
2023. See id. at 109-10; Gov't Ex. 210.

After Detective Tepperman recovered the firearm from the
window ledge, Sergeant Burke contacted the NYPD Evidence

Collection Team to process the firearm. See Tr. at 145, 160. As Sergeant Burke testified, when firearms are recovered, the NYPD Evidence Collection Team is dispatched to take custody of the firearm, ensure the firearm is safe for transportation and vouchering, and take photographs and examine the firearm for DNA or fingerprints. See id. The NYPD Evidence Collection Team took approximately an hour and a half to arrive on the scene, during which time law enforcement froze the scene. See id. at 144, 160. The firearm was ultimately vouchered into evidence. See id. at 146.

### D. Procedural History

On August 2, 2023, a grand jury in this District returned a five-count indictment, charging the defendant with offenses related to the February 11, 2023 arrest (Counts One and Two) and offenses related to the alleged October 2022 carjacking (Counts Three, Four, and Five). The five counts are the same as the first five counts in the current superseding indictment. See Indictment, ECF No. 9.

On January 11, 2024, the defendant filed a motion to suppress evidence seized incident to his arrests on February 11, 2023, and June 15, 2023, and a motion to sever Counts One and Two from Counts Three, Four, and Five. ECF No. 32. The Government filed an opposition on February 1, 2024. ECF No. 33.

14

On February 5, 2024, a seven-count superseding indictment was filed, charging the defendant with two additional counts of wire fraud and aggravated identity theft. See Superseding Indictment. Count Six charges the defendant with wire fraud in violation of 18 U.S.C. §§ 1343 and 2, from about September 2022 through at least June 2023, in that he allegedly engaged in a scheme to steal debit cards and personally identifiable information, use the stolen debit cards to withdraw money from bank accounts in the names of other individuals, and use the stolen personally identifiable information to fraudulently apply for credit cards in the names of other individuals. See id. Count Seven charges the defendant with aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2, from about September 2022 through at least June 2023, in that he allegedly used a means of identification of another person in relation to the wire fraud offense charged in Count Six. See id. The Court held an evidentiary hearing on the defendant's motion to suppress on February 26, 2024.

After the evidentiary hearing, the parties filed additional briefing on the defendant's motion to sever. ECF Nos. 47 and 48. Then, in his reply, the defendant withdrew his motion to sever Counts Six and Seven from Counts Three, Four, and Five, and instead moved to sever Counts One and Two from the remaining counts. Def.'s Reply to Mot. to Sever at 1, ECF No. 49. The

15

parties also filed post-hearing briefs on the defendant's motion
to suppress. ECF Nos. 48, 52, and 55.

## II. Motion to Suppress

### A. February 11, 2023

The defendant argues that the evidence recovered from him
incident to his February 11, 2023 arrest should be suppressed
because the evidence was the fruit of an initial unlawful stop
of the defendant along with Individual-1, and because Officer
Hijazi stopped and frisked the defendant without reasonable
suspicion and arrested the defendant without probable cause. See
Def.'s Mot. to Supp. at 1-10, ECF No. 48.

### i. Whether the Defendant Was Initially Stopped

The threshold question is whether the defendant was stopped
when the officers approached the defendant and Individual-1, and
Officer Malfetano stopped and frisked Individual-1.

"Law enforcement officers do not violate the Fourth
Amendment by merely approaching an individual on the street . .
. ."[2] United States v. Hooper, 935 F.2d 484, 490 (2d Cir. 1991).
A stop or seizure within the meaning of the Fourth Amendment
occurs only when an officer, by means of physical force or show
of authority, restrains the liberty of an individual. See id. at
491 (citing Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In other

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal
alterations, citations, footnotes, and quotation marks in quoted text.

words, an individual is "seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable [innocent] person would have believed that he was not free to leave." Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)); see also Florida v. Bostick, 501 U.S. 429, 438 (1991) ("[T]he reasonable person test presupposes an innocent person.").

Factors relevant to a determination of whether a seizure has occurred include: "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room." Hooper, 935 F.2d at 490 (collecting cases).

In this case, in view of all of the circumstances, the defendant was not stopped along with Individual-1. Officer Malfetano's stop and frisk of Individual-1 lasted only about thirty seconds. See Gov't Ex. 101. None of the officers retained or even asked to see the defendant's identification or other personal effects. Cf. Mendenhall, 446 U.S. at 555 ("The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her

17

ticket and identification, and posed to her a few questions."). Nor did the officers display any weapons or physically touch the defendant. See Gov't Ex. 102.

Moreover, there is no evidence that the officers requested that the defendant accompany the officers to the police station or comply with any other instructions. To the contrary, the defendant attested that the only words spoken to him by any of the officers was a question by one of the officers as to whether the defendant was with and knew Individual-1. See Aff. of Jonathan Torres ¶ 4, ECF No. 32-2.

Finally, there is no evidence that the officers prevented the defendant from leaving. While the defense relies on the fact that there were four officers in the group and that there was no room for the defendant to wheel his chair through the group, there is no evidence that they used that presence to retrain him. Rather, the defendant asserted that the officers "allowed [him] to leave the location" after the encounter that lasted just thirty seconds. See id. ¶ 6. Although there were four officers in close proximity to the defendant and Individual-1, there is no evidence that the officers' presence was "threatening" or otherwise converted the encounter into a stop. Cf. United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) (finding that a stop had not occurred even though "four officers were present" and "two approached and questioned" the

18

defendant). The parties do not cite to any case that indicates
that the brief encounter in this case amounted to a Terry stop
of the defendant. Rather, the most comparable cases cited by the
parties indicate that the situation in this case did not rise to
a Terry stop. See United States v. Serrano, 695 F. App'x 20, 22-
23 (2d Cir. 2017) (holding that the defendant was not seized
when officers approached him and asked for identification and
what he was doing in the neighborhood but did not touch the
defendant, display weapons, receive any of his possessions or
identification, or give him any orders); United States v.
Madison, 936 F.2d 90, 93-96 (2d Cir. 1991) (holding that an
individual on a commuter bus was not seized when he was
questioned by two law enforcement officers partially blocking
the aisle because the officers did not display weapons, did not
touch the individual, spoke to the individual in a
"conversational and polite" manner, and did not ask to see the
individual's ticket or identification).

Accordingly, the defendant was not stopped along with
Individual-1 when the officers approached the defendant and
Individual-1, and Officer Malfetano conducted a stop and frisk
of Individual-1.

### ii. Reasonable Suspicion

In any event, the officers would have had reasonable
suspicion to conduct a Terry stop of the defendant.

Pursuant to Terry v. Ohio, law enforcement officers may conduct a temporary investigative stop, consistent with the Fourth Amendment, with less than probable cause. However, "[t]o conduct a Terry stop -- that is, a temporary detention of an individual -- a police officer must have reasonable suspicion that the individual has engaged in or is about to engage in criminal activity." United States v. Hawkins, 37 F.4th 854, 857 (2d Cir. 2022). Reasonable suspicion is less than probable cause and must be established by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Id. And the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Reasonable suspicion is determined from the "totality of the circumstances." Hawkins, 37 F.4th at 858.

Considering the totality of the circumstances, the officers in this case had reasonable suspicion based on specific and articulable facts that the defendant had engaged in or was about to engage in criminal activity. The Court of Appeals for the Second Circuit has held that there are "circumstances under which reasonable suspicion created by one person can taint another individual." United States v. Tehrani, 49 F.3d 54, 59 (2d Cir. 1995) (citing United States v. Jaramillo, 25 F.3d 1146 (2d Cir. 1994)). Reasonable suspicion as to an individual can

20

give rise to reasonable suspicion as to the individual's companion if: (1) there is a connection between the two individuals and (2) there is an adequate basis to believe that the individuals are acting in concert. See id. at 60 (citing United States v. Patrick, 899 F.2d 169, 172 (2d Cir. 1990)).

In this case, there was a clear connection between Individual-1 and the defendant. Individual-1 and the defendant traveled eastbound together on 137th Street, continued onto Brown Place together, and were still traveling together when the officers approached them on Brown Place. See Tr. at 11-12, 15-16. There was also an adequate basis for the officers to believe that Individual-1 and the defendant were acting in concert. The officers testified that, just as Individual-1 acted evasively by jaywalking across Brown Place after making eye contact with Officer Malfetano and shielding his right side from the view of the car, see id. at 12-15, the defendant also appeared nervous and attempted to evade contact with the officers by first heading southbound toward 137th Street then turning back around once other officers appeared, see id. at 72. As a result, just as the officers had reasonable suspicion to stop Individual-1, the officers also had reasonable suspicion to stop the defendant.

The officers did, in fact, have reasonable suspicion to believe, based on the totality of the circumstances, that

21

Individual-1 had engaged in or was about to engage in criminal activity. Individual-1 acted evasively upon observing the officers. <u>See</u> <u>id.</u> at 12; <u>see also</u> <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). Additionally, Individual-1 was wearing a ski mask, and Officer Malfetano observed what appeared to be a weighted object consistent with the appearance of a firearm in Individual-1's right jacket pocket. <u>See</u> Tr. at 11, 13-14. All of this occurred in a "high-crime" neighborhood. <u>See</u> <u>id.</u> at 7, 10, 37, 39, 67, 70; <u>United States v. Simmons</u>, 560 F.3d 98, 108 (2d Cir. 2009) (finding that the individual's suspicious behavior viewed in light of the circumstances -- it being nighttime and the neighborhood being a high-crime area -- supported reasonable suspicion).

Moreover, if the interaction between the officers and the defendant were a stop, such a stop would have been reasonably related in scope to the circumstances. Officer Malfetano's frisk of Individual-1 was justified by Officer Malfetano's testimony that he observed a bulge in the shape of a firearm in Individual-1's right jacket pocket. <u>See</u> Tr. at 13-14. Moreover, the stop lasted only about thirty seconds and concluded shortly after the frisk of Individual-1 ended. <u>See</u> Gov't Ex. 101.

Accordingly, the officers would have had reasonable suspicion to stop the defendant along with Individual-1 in any case.

### iii. Stop, Frisk, and Arrest of the Defendant

The remaining question is whether Officer Hijazi's stop and frisk of the defendant and the defendant's subsequent arrest were constitutional.

After stopping a suspect upon reasonable suspicion, an officer may conduct a protective search for weapons if the officer has "reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. In other words, "[t]o support an accompanying frisk for weapons, the officer must also have reasonable suspicion that the person subjected to the frisk is armed and dangerous." Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016). An "officer need not be absolutely certain that the individual is armed." Terry, 392 U.S. at 27. Rather, it is sufficient if an officer is aware of articulable facts suggesting that an individual may be armed and dangerous. See United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (pat-down search is warranted so long as "the person stopped may be armed and presently dangerous").

Based on the testimony and body-worn camera footage of Officer Hijazi, as well as the stills of the footage, Officer

Hijazi had reasonable suspicion to stop and frisk the defendant.[3]
There was plainly an L-shaped bulge in the defendant's front
sweatshirt pocket visible in the body-worn camera footage and
stills, see Gov't Exs. 104, 104A, 104B, 104C, as Officer Hijazi
testified, see Tr. at 73-74. Furthermore, the footage and the
stills show the defendant acted suspiciously in attempting to
conceal and clutch the L-shaped bulge, see Gov't Exs. 104, 104A,
104B, 104C, as Officer Hijazi testified, see Tr. at 80-81.
Indeed, as Officer Hijazi testified, the defendant later stated
that "he should have shot [Officer Hijazi]." Id. at 75. Thus,
Officer Hijazi had reason to believe based on articulable facts
that he was dealing with an armed and dangerous individual, and
therefore he properly conducted a frisk of the defendant.

The defendant also argues that the officers did not have
sufficient probable cause to arrest the defendant because,
"after New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597
U.S. 1 (2022)[,] suspicion that a person has a handgun is not
sufficient to justify a street stop . . . ." Def.'s Mot. to
Supp. at 10 n.3 (citing United States v. Homer, No. 23-cr-86,
2024 WL 417103, at *1 (E.D.N.Y. Feb. 5, 2024)). But there is

---

[3] The defendant's attempt to impeach Officer Hijazi's testimony, see Def.'s
Mot. to Supp. at 7-9, is without merit. Officer Hijazi has participated in
approximately 150 arrests in almost six years with the NYPD. See Tr. at 81.
In that time, he has had six lawsuits filed against him. See id. at 88.
However, there is no evidence of any charges that have been substantiated
against him. See id. at 90. Furthermore, Officer Hijazi's testimony was
supported by his body-worn camera footage, and the Court found Officer
Hijazi's testimony to be credible.

nothing in Bruen that alters the well-established law in this
Circuit that the possession of a firearm provides probable cause
to arrest. See, e.g., United States v. Hagood, 78 F.4th 570,
572-73, 577-80 (2d Cir. 2023) (affirming the district court's
decision that the police had reasonable suspicion to support a
Terry stop, subsequent frisk, and arrest upon finding a
firearm). Bruen has changed the circumstances under which a
person can obtain a license to carry a firearm. But that does
not mean that a person who possesses a firearm without any claim
of lawful, licensed possession, and conceals the firearm and
acts in a suspicious manner, has not provided probable cause to
arrest. Moreover, in this case, there was sufficient evidence --
beyond the mere fact that the defendant had a firearm -- to
establish probable cause that the defendant was possessing the
firearm illegally and not pursuant to a license. In particular,
the defendant acted suspiciously by attempting to evade contact
with Officer Malfetano when Officer Malfetano approached and
then turning back around once Officers Hennessy and Roveto
approached, see Tr. at 72, and attempting to conceal and clutch
the firearm inside his front hoodie pocket when he was
approached by Officer Hijazi, see id. at 72, 74; Gov't Exs. 104,
104A, 104B, 104C. Furthermore, the defendant never protested
that he had a license to carry the firearm. Accordingly, the
officers had probable cause to arrest the defendant.

In summary, the defendant's motion to suppress the evidence recovered from him incident to his February 11, 2023 arrest is **denied**.

## B. June 15, 2023

The defendant argues initially that all of the items seized at the time of the defendant's arrest on June 15, 2023, should be suppressed because the arrest warrant for the defendant's arrest was the fruit of the allegedly unlawful stop and frisk of the defendant on February 11, 2023, and was therefore invalid. See Def.'s Mot. to Supp. at 10-11. However, for the reasons explained above, there was nothing unconstitutional or unlawful about the defendant's stop, frisk, and arrest on February 11, 2023. Therefore, there is no merit to this argument.

The defendant also argues that the driver's license and firearm recovered incident to his June 15, 2023 arrest should be suppressed because, among other reasons, the driver's license was not in plain view, and the firearm was not seized pursuant to a valid protective sweep or exigent circumstances. See id. at 10-13; Def.'s Reply to Mot. to Supp. at 19-21, ECF No. 55.[4]

---

[4] The evidence seized incident to the defendant's June 15, 2023 arrest include a driver's license, firearm, cell phone, and money. See Gov't's Opp'n to Mot. to Supp. at 25, ECF No. 52. There is no basis to suppress the cell phone and the money that were seized from the defendant's person during the course of the defendant's arrest. See United States v. Robinson, 414 U.S. 218, 235 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that Amendment."). And the defendant makes no additional argument with respect to these items.

### i. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. XIV. Accordingly, "[s]earches and seizures inside a home without a warrant are presumptively unreasonable . . . ." United States v. Karo, 468 U.S. 705, 714–15 (1984). Under the Fourth Amendment, an arrest warrant and a search warrant are not the same: "the area that may legally be searched is broader when executing a search warrant than when executing an arrest warrant in the home." Payton v. New York, 445 U.S. 573, 589 (1980).

However, there are two well-established exceptions to the need for a search warrant to conduct a search within a home: exigent circumstances, see Coolidge v. New Hampshire, 403 U.S. 443, 474–75 (1971), and consent, see Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). As relevant to this case, exigent circumstances exist, and the police may conduct a warrantless search of a home, when there is "hot pursuit of a fleeing felon, [the risk of] imminent destruction of evidence, . . . the need to prevent a suspect's escape, or the risk of danger to the

---

Therefore, there is no basis to suppress the cell phone and money seized incident to the defendant's June 15, 2023 arrest.

police or to other persons inside or outside the dwelling."
Minnesota v. Olson, 495 U.S. 91, 100 (1990).

If the police are lawfully in a home, such as in the course
of executing an arrest warrant, the officers may conduct a
"protective sweep." A "protective sweep" is "a quick and limited
search of premises, incident to an arrest and conducted to
protect the safety of police officers or others" that "is
narrowly confined to a cursory visual inspection of those places
in which a person might be hiding." Maryland v. Buie, 494 U.S.
325, 327 (1990). Accordingly, during a protective sweep,
officers are permitted to search "spaces where a person may be
found" such as "closets and other spaces immediately adjoining
the place of arrest from which an attack could be immediately
launched." United States v. Delva, 858 F.3d 135, 148-49 (2d Cir.
2017). A protective sweep can involve both a search for
individuals and a search for "weapons within the grab area of an
individual whom the government agents have reasonably concluded
is dangerous." United States v. Hernandez, 941 F.2d 133, 137 (2d
Cir. 1991). Under the related plain view doctrine, officers may,
during a protective sweep, seize an object "if its incriminating
character is immediately apparent" as long as the officers are
"lawfully in a position" to view and access the object. Delva,
858 F.3d at 149.

Once a defendant establishes a basis for a suppression motion, the Government must prove that the search was proper by a preponderance of the evidence. See, e.g., United States v. Matlock, 415 U.S. 164, 177 (1974).

### ii. Driver's License

In this case, the officers had the authority to conduct a protective sweep of the defendant's bedroom to assure the safety of the officers and others in the apartment. See Delva, 858 F.3d at 148-49. When the officers entered the defendant's bedroom, the officers were not yet sure whether another individual may be found in the bedroom, which adjoined the hallway where the defendant was arrested. As both Sergeant Burke and the defendant's mother testified, the officers entered the defendant's bedroom almost immediately after entering the apartment, see Tr. at 135, 141, 184, and therefore the officers could not have been sure that everyone in the apartment was accounted for. And as Sergeant Burke testified, the defendant's bedroom was only seven or eight feet away from where the defendant was arrested in the hallway. See id. at 141.

Furthermore, the "incriminating character" of the driver's license was "immediately apparent" from where the officers were "lawfully in a position" to view and access the license. See Delva, 858 F.3d at 149. The officers were lawfully inside the defendant's bedroom and conducting a valid protective sweep. The

29

defendant argues that, but for the officers "giving themselves time to examine and notice additional contraband[,] . . . the counterfeit license would never have been found . . . ." Def.'s Reply to Mot. to Supp. at 21. However, a Government photo exhibit clearly demonstrates that the driver's license -- located on top of the desk in front of the window -- was in plain view of an officer inside the defendant's bedroom. See Gov't Ex. 206.

Moreover, the "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence." United States v. Babilonia, 854 F.3d 163, 180-81 (2d Cir. 2017). In this case, the officers had probable cause to believe that the driver's license would constitute evidence. On its face, the counterfeit driver's license with the defendant's photo was evidence of identity theft. The fact that the officers waited for the NYPD Evidence Team to remove the license has no bearing on the fact that the driver's license was properly seized in plain view during a valid protective sweep.

Accordingly, the defendant's motion to suppress the driver's license is **denied.**

### iii. Firearm

With respect to the firearm seized on June 15, 2023, the Government argued after the suppression hearing that the firearm

30

was properly seized in conjunction with a valid protective sweep. <u>See</u> Gov't's Opp'n to Mot. to Supp. at 25-27.

In this case, although the officers were permitted to conduct a protective sweep of the defendant's bedroom, the proper scope of the protective sweep did not include searching the area under the air conditioning unit outside of the defendant's bedroom window. The area outside of the defendant's bedroom window was plainly not a space "where a person may be found" or "from which an attack could be immediately launched." <u>Delva</u>, 858 F.3d at 148-49. At the time that Detective Tepperman searched under the air conditioning unit and retrieved the firearm, Special Agent Tallio had been looking up at the window, such that he was able to see a "thumbs up," when the firearm was recovered. <u>See</u> Tr. at 107-08, 137. And at no point did Special Agent Tallio report seeing a person outside of the apartment window. <u>Cf.</u> <u>United States v. Santos</u>, 303 F. Supp. 2d 333, 348 n.29 (S.D.N.Y. 2003) (finding that, assuming a lawful arrest, the protective sweep doctrine would not justify an officer's search of a "hump" under a rug to recover a firearm because the officer clearly did not believe that the "hump" was a person).

Nor was the "[firearm] within the grab area of an individual whom the government agents ha[d] reasonably concluded [wa]s dangerous." <u>Hernandez</u>, 941 F.2d at 137. At the time that the area under the air conditioning unit was searched, the

defendant was the only individual in the apartment whom the officers could have reasonably concluded was dangerous. However, the firearm located under the air conditioning unit was seven or eight feet plus the entire length of the defendant's bedroom away from the defendant. <u>See</u> Tr. at 141. Moreover, the defendant had already been placed under arrest at that time. <u>See</u> <u>id.</u> at 135.

Nor was the area under the air conditioning unit outside of the defendant's bedroom window, where the firearm was found, an area that was in plain view of the officers in the defendant's bedroom. As evident from one of the Government's photo exhibits, the area under the air conditioning unit is not in plain view of someone standing within the defendant's bedroom. <u>See</u> Gov't Ex. 202. Rather, the area is visible only to someone who physically leans out of the window. <u>See</u> Gov't Ex. 203. In other words, the "incriminating character" of the firearm was not "immediately apparent" from the defendant's bedroom, where the officers were lawfully present. <u>Delva</u>, 858 F.3d at 149. Accordingly, the officers were not authorized to seize the firearm pursuant to a protective sweep.

The Government argues that the firearm was nevertheless properly seized pursuant to the exigent circumstances doctrine. <u>See</u> Gov't's Opp'n to Mot. to Supp. at 27-28. In particular, the Government argues that the exigent circumstance was "[t]he

potential danger to law enforcement" of "a gun on an outside window ledge" and "not know[ing] who or how many people were in the apartment." See id. at 27. Therefore, the Government seems to argue, "reach[ing] out the window to retrieve the firearm" was essential to law enforcement and general safety. See id. at 28.

The "exigent circumstances" doctrine applies to excise a warrant requirement where, based on the totality of the circumstances it is necessary for law enforcement agents to act without delay. See United States v. McDonald, 916 F.2d 766, 769 (2d Cir. 1990). It normally applies to justify a warrantless entry where law enforcement agents are confronted with an "urgent need" to render aid or take action. See id. "[I]t is well-settled . . . that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay," United States v. Moreno, 701 F.3d 64, 72-73 (2d Cir. 2012); see, e.g., Kentucky v. King, 563 U.S. 452, 460 (2011) ("One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.") (quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978)); United States v. Andino, 768 F.3d 94, 98 (2d Cir. 2014); MacDonald, 916 F.2d at 769. "And in any determination of

33

whether there were exigent circumstances sufficient to justify conduct for which the Fourth Amendment normally requires a warrant, the fundamental question is whether it was objectively reasonable for the law enforcement officers to believe there was an urgent need for that warrantless conduct." Delva, 858 F.3d at 153 (citing Riley v. California, 573 U.S. 373, 391, 401-02 (2014); King, 563 U.S. at 460-62).

In this case, the Government has not met its "heavy burden when attempting to demonstrate an urgent need that might justify [a] warrantless search[] . . . ." Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984). After retrieving the firearm, Detective Tepperman placed the firearm inside the apartment on a desk in the defendant's bedroom where it remained for about an hour and a half while the police waited for the NYPD Evidence Team to arrive. See Tr. at 137; Gov't Exs. 204, 205, 206. It is difficult to see how this action -- which moved the firearm closer to anyone who might be inside the apartment -- was objectively reasonable. If safety of the individuals inside the apartment were the concern, one of the officers could continue to guard the window until a warrant was obtained. If the firearm posed a danger, the officers would not have left it on the table for over an hour while they waited for the evidence team to come and inventory it.

The Government also appears to argue that the firearm under the air conditioning unit "raised safety concerns for the public . . . ." Gov't's Opp'n to Mot. to Supp. at 7. However, to the extent that the safety concern was the firearm falling from the window and thereby being accessible to others on the street, Special Agent Tallio was stationed outside the apartment with his eyes on the window, see Tr. at 107-08, so that he would notice if the firearm fell and he could prevent others from accessing the firearm. Accordingly, this, too, is not an objectively reasonable justification for the search and subsequent seizure.

If the Government's argument is that the firearm could have fallen and discharged, see Gov't's Opp'n to Mot. to Supp. at 8, that argument was raised for the first time after the suppression hearing, see Gov't's Opp'n to Def.'s First Mot. to Supp. passim. Furthermore, only one of the officers -- Sergeant Burke -- testified to that risk. See Tr. at 136. And there is no evidence of the actual danger that the firearm would spontaneously fall and discharge. "[T]he mere presence of a firearm does not, on its own, create the urgency necessary for exigent circumstances." Harris v. O'Hare, 770 F.3d 224, 239 (2d Cir. 2014), as amended (Nov. 24, 2014). The Court of Appeals for the Second Circuit has recognized that "an officer's professed belief that he was permitted, as a community caretaker, to

35

invade . . . curtilage without a warrant in search of illegal
guns would not be reasonable." Id. at 239 n.10; see also Rivera
ex rel. Rivera v. Leto, No. 04-cv-7072, 2008 WL 5062103, at *5
n.5 (S.D.N.Y. Nov. 25, 2008) (finding that there are no
decisions supporting the argument that there is a separate
community caretaking exception that would apply in the absence
of exigent circumstances).

Therefore, the defendant's motion to suppress the firearm
recovered on June 15, 2023 is **granted.**

### III. Motion to Sever

Finally, the defendant moves to sever Counts One and Two --
relating to the distribution of narcotics and the use of a
firearm in furtherance of the distribution in connection with
the February 11, 2023 incident -- from the remaining charges --
Counts Three through Five relating to carjacking on October 13,
2022, and Counts Six and Seven for wire fraud and identity theft
from about September 2022 through at least June 2023. See Def.'s
Reply to Mot. to Sever at 1. The Government represents that part
of the evidence for Counts Six and Seven is that the defendant
stole debit cards from a cab driver that allegedly provided
transportation to the defendant on September 26, 2022, less than
a month before the hijacking of the cab driver that is at issue
in Counts Three, Four, and Five of the Indictment. See Gov't's
Opp'n to Mot. to Sever at 2, ECF No. 47.

36

### A. Standard of Review

Rule 8(a) of the Federal Rules of Criminal Procedure provides that multiple charges may properly be joined in the same indictment "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a); see also United States v. McGrath, 558 F.2d 1102, 1106 (2d Cir. 1977) (Rule 8 sets forth a "liberal standard for joinder."). "Similar charges include those that are somewhat alike, or those having a general likeness to each other." United States v. Rivera, 546 F.3d 245, 253 (2d Cir. 2008). Counts may be joined when they have "sufficient logical connection" to one another. United States v. Ruiz, 894 F.2d 501, 505 (2d Cir. 1990).

Once this standard has been met, the charges should not be severed unless "the joinder of offenses . . . appears to prejudice [the] defendant . . . ." Fed. R. Crim. P. 14(a); see also United States v. Werner, 620 F.2d 922, 928–29 (2d Cir. 1980) ("[S]ubstantial prejudice from a denial of relief under Rule 14 must be shown . . . ."). A defendant seeking severance shoulders the "difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. See United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989).

**B. Discussion**

**i. Rule 8(a)**

The defendant initially argues that Counts One and Two are not of the "same or similar character" as Counts Six and Seven, so as to be properly joined under Rule 8(a). See Def.'s Reply to Mot. to Sever at 2. In response, the Government argues that joinder is proper because there is a "sufficient logical connection" between Counts Three through Five and Counts Six and Seven and a similarly "sufficient logical connection" between Counts Three through Five and Counts One and Two. Gov't's Opp'n to Mot. to Sever at 7-8.

The Court of Appeals for the Second Circuit has held that, for joinder under Rule 8(a) to be proper, all counts must be of the same or similar character and constitute part of a common pattern of conduct. See United States v. Tubol, 191 F.3d 88, 94-95 (2d Cir. 1999) (finding that, while a gun possession charge was properly joined to either of two separate robbery charges, the robbery charges were not properly joined because they involved two robberies involving different methods and victims, notwithstanding the fact that both robberies involved a gun). This case is similar to Tubol. Even if the carjacking charges (Counts Three through Five) are properly joined to both the drug and firearm charges (Counts One and Two) and wire fraud and identity theft charges (Counts Six and Seven), as the Government

38

argues, see Gov't's Opp'n to Mot. to Sever at 7-8, that does not show that the drug and firearm charges (Counts One and Two) are properly joined with the wire fraud and identity theft charges (Counts Six and Seven). Indeed, the Government fails to provide any explanation as to why the drug and firearm charges are of the same or similar character or constitute part of a common pattern of conduct with the wire fraud and identity theft charges. See United States v. Martinez, No. 92-cr-839, 1993 WL 322768, at *8-10 (S.D.N.Y. Aug. 19, 1993) (finding joinder of two charges under Rule 8(a) to be improper where the indictment in no way suggested that the charges were related or part of the same conspiracy and rejecting a similar argument that two unrelated charges should be joined because the charges are each related to a third count).

Accordingly, joinder of Counts One and Two to Counts Six and Seven is improper under Rule 8(a).

## ii. Substantial Prejudice

The defendant also argues that he would be significantly prejudiced under Rule 14 by the joinder of Counts One and Two to the remaining counts. See Def.'s Reply to Mot. to Sever at 4.

A defendant seeking a severance must demonstrate "that the prejudice to [the defendant] from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Panza, 750

F.2d 1141, 1149 (2d Cir. 1984). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro v. United States, 506 U.S. 534, 538-39 (1993). In this case, the likely prejudice to the defendant outweighs considerations of judicial economy. As to the narcotics possession charge, the Government does not argue that the defendant's possession of narcotics would be admissible at a trial of Counts Three through Seven, see Gov't's Opp'n to Mot. to Sever at 13. The defendant argues correctly that evidence of the narcotics charge would be significantly prejudicial to the defendant. See Def.'s Reply to Mot. to Sever at 4. The defendant's possible guilt of the narcotics charge would raise the possibility of unfair prejudice from the defendant's alleged association with the distribution of drugs that is unrelated to any of the other charges in the case. Joinder of the drug charge would also be unfairly prejudicial because it could lead the jury to infer that the defendant has a general propensity for criminality. See Def.'s Reply to Mot. to Sever at 4.

Accordingly, the defendant's motion to sever Counts One and Two is **granted**.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to suppress the evidence seized incident to his February 11, 2023 and June 15, 2023 arrests is **granted in part and denied in part,** and the defendant's motion to sever Counts One and Two is **granted.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:      New York, New York
            March 22, 2024

                                        _____
                                                John G. Koeltl
                                        **United States District Judge**

41