UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- AGAINST -

JONATHAN TORRES,

DEFENDANT.

23 Cr. 395 (JGK)

**Defendant's Motion *in Limine* to Preclude or Limit the
Government's Proposed Expert Testimony**

ZMO Law PLLC
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999
zach@zmolaw.com

*ATTORNEYS FOR DEFENDANT JONATHAN TORRES*

# TABLE OF CONTENTS

THE GOVERNMENT'S DEFICIENT EXPERT DISCLOSURE.....................................2

    A.   Ten Background Points .........................................................................2

    B.   Opinion as to Mr. Torres's Intent to Distribute ....................................4

    C.   Opinion as to Lolo Boy Text Conversation ............................................5

    D.   Opinion as to Conversation with Ma Brook Ave.....................................5

    E.   Opinion as to Firearms .........................................................................6

RULES GOVERNING LAW ENFORCEMENT EXPERT TESTIMONY .......................6

    A.   Rules 702 and 704(b) limit expert testimony to that which is based on
        reliable principles and methods, helpful to the jury, and does not
        concern an ultimate mental state in issue...............................................6

    B.   The Rise of the "Officer Expert" and the Limits of Such Testimony .......8

ARGUMENT ..........................................................................................................12

    I.   MR. HERNANDEZ'S PROPOSED TESTIMONY SHOULD BE EXCLUDED
        BECAUSE IT VIOLATES RULE 704(B) WHICH PROHIBITS EXPERT
        OPINION "ABOUT" WHETHER MR. TORRES INTENDED TO DISTRIBUTE
        NARCOTICS. ...................................................................................13

    II.   MR. HERNANDEZ'S PROPOSED TESTIMONY SHOULD BE EXCLUDED
        BECAUSE IT IS NOT BASED ON RELIABLE PRINCIPLES AND METHODS.16

    III.  MR. HERNANDEZ'S PROPOSED OPINION TESTIMONY SHOULD BE
        EXCLUDED BECAUSE IT IS BASED ON COMMONSENSE INFERENCE, NOT
        SPECIALIZED KNOWLEDGE OR EXPERIENCE............................................20

    IV.  MR. HERNANDEZ'S PROPOSED TESTIMONY SHOULD BE EXCLUDED
        BECAUSE THE EXPERT DISCLOSURE WAS DEFICIENT.............................21

    V.   EVEN IF ADMISSIBLE UNDER THE EXPERT RULES, MR. HERNANDEZ'S
        TESTIMONY SHOULD BE EXCLUDED BECAUSE ITS MINIMAL PROBATIVE
        VALUE IS SUBSTANTIALLY OUTWEIGHED BY A DANGER OF UNFAIR
        PREJUDICE, CONFUSING THE ISSUES, AND OR NEEDLESSLY
        PRESENTING CUMULATIVE EVIDENCE. ...................................................22

CONCLUSION .......................................................................................................24

Defendant Jonathan Torres is charged with, *inter alia,* possessing 16 purple vials containing doses of crack cocaine with intent to distribute them along with a concealed handgun "during and in relation" to the crack possession. *See* ECF No. 36: Superseding Indictment Counts One and Two. These charges are based on a warrantless police search of Mr. Torres's person while he was in his wheelchair on the street near his home in the South Bronx on February 11, 2023.

The government apparently intends to prove the "intent to distribute" element—which is necessary to obtain a conviction on each of these counts—through purported expert testimony of an experienced Drug Enforcement Administration Task Force Officer named Alfred Hernandez. According to a government disclosure, Mr. Hernandez will testify (1) that the drugs taken from Mr. Torres are "consistent" with distribution rather than personal use; and (2) that unrelated coded conversations found on Mr. Torres's phone are "consistent with" and "reflect" conversations about drug sales to others. As discussed below, the notice is deficient under the new requirements set forth in Rule 16 of the Federal Rules of Criminal Procedure and, as described, the proposed testimony is patently inadmissible under Rules 401, 402, 403, 702 and 704(b) of the Federal Rules of Evidence because it is irrelevant, not based on reliable principles and methods, relates to Mr. Torres's mental state, and usurps the role of the jury. It should not be received at all.

In the alternative, a *Daubert* hearing is necessary to identify the "principles and methods" that led to Inspector Hernandez's conclusions and otherwise give the government an opportunity to show that the testimony meets the requirements of Fed. R. Evid. 702.

<u>**THE GOVERNMENT'S DEFICIENT EXPERT DISCLOSURE**</u>

On March 18, 2024, the government disclosed to the defense a document entitled "Disclosure as to Expert Witness Alfred Hernandez" (hereinafter "Report"). The Report was signed by Mr. Hernandez but styled throughout as the *government's expectations* about Mr. Hernandez's testimony, rather than affirmative statements by Mr. Hernandez himself. It specified topic areas and conclusions but failed to describe principles or methods indicating how Mr. Hernandez came to his conclusions.

**A.      Ten Background Points**

The report first identifies ten points that Mr. Hernandez proposes to discuss regarding practices in the drug trade such as how powder cocaine is cooked into crack, prices for various drugs forms of cocaine, use of coded language and more. *See* Ex. A at 1. The Report reads as follows:

> [Mr. Hernandez] is expected to testify, based on his training and experience, regarding
>
> (1) the means and methods by which powder cocaine is cooked into crack cocaine;
>
> (2) the means and methods used to package and distribute quantities of cocaine and crack cocaine in the New York City area, [*sic*]
>
> (3) how cocaine and crack cocaine are packaged in retail quantities, including how, when cocaine or crack cocaine are sold by the gram, they are typically packaged in a single baggie, which contains the entire purchase amount, and when sold in smaller amounts, cocaine is typically sold in baggies that are priced at $20 each, and crack cocaine is often sold in baggies or vials, in quantities that are priced at $10 each;
>
> (4) typical pricing for cocaine and crack cocaine in the New York City area, including the price of a gram of cocaine and

crack cocaine, and comparing that to the amount of crack cocaine that is typically in a "dime bag" or "dime vial," which represents $10 worth crack cocaine;

(5) differences between how drug users purchase and store cocaine or crack cocaine as compared to how drug dealers purchase, package, and store cocaine or crack cocaine, including how retail drug dealers typically purchase crack cocaine in gram quantities and thereafter divide the grams into numerous baggies or vials, each of which they sell to retail customers for $10 each;

(6) when drug users have narcotics on their person, they also often have paraphernalia consistent with the use of those types of narcotics, including, for example for crack cocaine, a crack pipe;

(7) because drugs like cocaine and crack cocaine are illegal, customers will frequently pay for the drugs in cash;

(8) the use of slang and coded language by narcotics traffickers, [*sic*]

(9) how narcotics dealers often use digital scales for weighing the narcotics prior to distribution;

(10) narcotics dealers can carry a firearm on them if they are outside with the narcotics, in order to protect themselves, their drugs, and their drug-related proceeds.

Ex. A at 1 (paragraph spacing added for readability).

As discussed in more detail below, most of these points are not sufficiently described and none of them is admissible under Rules 401, 402, 403 and 702. The first five points and #8 and #9 are not "complete statements" of opinions that Mr. Hernandez will testify to, but rather general topic areas that the government wants him to be allowed to testify *about*. In other words, while the government has disclosed seven topic areas, it has not revealed what Mr. Hernandez will say about those topic areas, *except* in #3, where the government provides *some* examples of what Mr. Hernandez will say ("when cocaine

or crack cocaine are sold by the gram, they are typically packaged in a single baggie, which contains the entire purchase amount, and when sold in smaller amounts, cocaine is typically sold in baggies that are priced at $20 each, and crack cocaine is often sold in baggies or vials, in quantities that are priced at $10 each"), but tries to leave the door open to say more on "how cocaine and crack cocaine are packaged in retail quantities." Ex. A at 1.

Points #6, 7, and 10 may be statements of the witness's opinions but, as is discussed further below, the government makes no effort to disclose the "bases and reasons" for these opinions as required by the second bullet point in Fed. R. Crim. P. 16(a)(1)(G)(iii).

### B.     Opinion as to Mr. Torres's Intent to Distribute

After reciting some of Mr. Hernandez's training and some law enforcement information sources uses, Ex. A at 1, the government proposes to have Mr. Hernandez opine on the main issue in the case: that, in his opinion, "the 16 individual vials of narcotics seized on February 11, 2023 is [*sic*] consistent in quantity and packaging with someone [*sic*] who deals in narcotics, as opposed to someone who possesses narcotics for personal use." Ex. A at 2. The government goes on to explain the basis for this conclusion in a short paragraph, unsupported by any sources, studies, citations, or extrinsic evidence:

> In particular, Inspector Hernandez is expected to testify that the packaging in vials and the amount of narcotics in each vial is consistent with the packaging and amount for the retail sale of $10 worth of crack cocaine. Accordingly, the 16 vials of crack cocaine would cost $160, but collectively would contain about a gram of crack cocaine. This packaging and cost is therefore consistent with resell as opposed to personal use because if a person were to purchase a gram of crack cocaine in New York City, it would cost approximately $35, and would not be divided into multiple vials, but rather

combined into one container, typically a baggie. Given that the 16 vials here contained approximately a gram of crack cocaine, yet would have cost $160, it would not make sense for one person to have purchased all 16 vials for personal use.

Ex. A at 2.

### C. Opinion as to Lolo Boy Text Conversation

The notice proposes that Mr. Hernandez testify about the meaning of two text conversations extracted from a phone allegedly recovered from Mr. Torres. According to Mr. Hernandez, the first conversation, with "Lolo Boy," "is consistent with a discussion regarding the sale of re-distribution quantities of cocaine." Ex. A at 2. The notice refers to a photograph of a scale and a reference to "10 g." but otherwise does not specify the content of the conversation being interpreted. *Id*. Nonetheless, Mr. Hernandez claims to be able to conclude that "the communication and photograph are consistent with a narcotics supplier confirming to Torres the amount that the supplier is going to sell to Torres, and is a way that narcotics suppliers can confirm that they have the narcotics they are offering to sell and that they have it in the amount that is being ordered." *Id.* He proposes to go on to testify that ten grams of cocaine "is consistent with a redistribution quantity," enough to cook into 160 vials of crack. Mr. Hernandez will also testify about the meaning of a screenshot on the phone that amounts to a "narcotics conversion chart." *Id*.

### D. Opinion as to Conversation with Ma Brook Ave

Mr. Hernandez proposes to opine about the meaning of a text conversation with "Ma Brook Ave." Again without identifying the exact language that he is interpreting, Mr.

Hernandez opines that the conversation "is consistent with a discussion of Torres providing 25 units of narcotics to Ma Brook Ave to then sell to customers." According to Mr. Hernandez, the conversation shows that Ma Brook Ave would sell the unspecified drugs for $250 and keep $100. Mr. Torres offers to supply more if Ma Brook Ave can "successfully sell what [Mr.] Torres gave him." Ex. A at 2.

### E. Opinion as to Firearms

Finally, Mr. Hernandez "is expected to testify that narcotics traffickers can keep firearms to protect themselves and their narcotics in the drug business and further their drug trafficking" and that Mr. Torres's "possession of a firearm and narcotics while outside at dark [*sic*] is consistent with a narcotics dealer possessing a firearm to protect his narcotics and himself while he sells." Ex. A at 2-3.

## RULES GOVERNING LAW ENFORCEMENT EXPERT TESTIMONY

### A. Rules 702 and 704(b) limit expert testimony to that which is based on reliable principles and methods, helpful to the jury, and does not concern an ultimate mental state in issue.

An expert witness may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court read Rule 702 as requiring that expert testimony "must be supported by appropriate validation—i.e., good grounds based on what is known" and set out factors that courts should consider in making that determination. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 590 (1993). Daubert's general principles apply to all expert matters described in Rule 702, "whether the testimony reflects scientific, technical, or other specialized knowledge." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). Under *Daubert* and its progeny, district courts play a "gatekeeping" role to ensure that expert testimony presented to the jury meets "exacting standards of reliability." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). The gatekeeping role requires the court "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

In a criminal case, Rule 704(b) of the Federal Rules of Evidence further restricts expert testimony. Under the Rule, "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). The rule recognizes "that expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *U.S. v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993); *see also U.S. v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6162865, at *2 (S.D.N.Y. Sept. 21, 2023) (precluding expert opinion that was "semantic camouflage" for opinion about mens rea); *U.S. v. Finley*, 301 F.3d 1000, 1014 (9th Cir. 2002) ("Expert

testimony that compels the jury to conclude that the defendant did or did not possess the requisite *mens rea* does not 'assist the trier of fact' under Rule 702 because such testimony encroaches on the jury's vital and exclusive function to make credibility determinations.").

**B.      These rules apply limit "Officer Expert" testimony despite its increasing use.**

As the Second Circuit has observed, in the 1980s "a new type of 'skilled witness' began emerging: the law enforcement officer." *U.S. v. Mejia*, 545 F.3d 179, 189 (2d Cir. 2008). "In criminal cases, the Government began calling law enforcement officers to testify as experts on . . . the nature and structure of organized crime families." *Id.* The Second Circuit initially approved specific types of such testimony, including testimony about organized crime terms and jargon used in narcotics trafficking. *See id.* Such testimony was deemed helpful insofar as it could provide helpful background in "the inner workings of a closed community." *Id.* at 190.

Even where law enforcement expert testimony was approved, however, the Circuit "carefully circumscribed the use of such testimony to occasions where the subject matter of the testimony is beyond the ken of the average juror." *U.S. v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991). "The principles pertaining to expert testimony apply with full force where law enforcement officials are called on to provide scientific, technical, or other specialized knowledge to the trier of fact." *U.S. v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004).

Where experts testified about the operations of narcotics dealers and the codes they used, the Circuit expressed "some degree of discomfiture . . . since, uncontrolled, such use of expert testimony may have the effect of providing the government with an additional

summation by having the expert interpret the evidence." *U.S. v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987).

The Second Circuit's uneasiness grew to outright disapproval when prosecutors pushed the boundaries of law enforcement testimony. In *Castillo*, for example, the court vacated convictions because of improper expert testimony about how drug dealers "typically" use scales to weigh their products, sell drugs out of vacant apartments, and keep guns in their waistbands. *U.S. v. Castillo*, 924 F.2d at 1233. The Circuit reasoned:

> Simply stated, we are not convinced that New York jurors in today's climate, flush with daily news of the latest drug bust, need an expert to enlighten them as to such elementary issues as the function of a scale or index card in a drug deal.

*Id*. In vacating the *Castillo* convictions, the appeals court identified one of the critical defects of expert testimony regarding how drug dealers "typically" operate: The government too often uses such testimony to argue that the defendant is acting "the way every good drug dealer . . . acts" and therefore is putting forth "the impermissible theory that [the defendant's] guilt could be inferred from the behavior of unrelated persons." *Id*. at 1234; *see also U.S. v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992) ("[E]xpert testimony cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events.").

The Second Circuit has also criticized the developing practice of law enforcement testimony not just about drug dealing practices *generally* but also about how evidence *in the particular case* is "consistent" with such practices:

> [T]here is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found in narcotics cases, leaving it

for the jury to determine whether the defendant's conduct fits
the pattern, but also that such conduct fitted that pattern.

*U.S. v. Brown*, 776 F.2d 397, 401 (2d Cir. 1985); *see also U.S. v. Zhong*, 26 F.4th

536, 556 (2d Cir. 2022) (government may not use expert testimony to "interpret and

vouch for the admissible evidence it ha[s] offered"). The Circuit has analyzed the problem

of prosecutors calling law enforcement "experts" with specific knowledge of the evidence

in a case or investigation:

> An increasingly thinning line separates the legitimate use of
> an officer expert to translate esoteric terminology or to
> explicate an organization's hierarchical structure from the
> illegitimate and impermissible substitution of expert opinion
> for factual evidence. If the officer expert strays beyond the
> bounds of appropriately "expert" matters, that officer
> becomes, rather than a sociologist describing the inner
> workings of a closed community, a chronicler of the recent
> past whose pronouncements on elements of the charged
> offense serve as shortcuts to proving guilt. As the officer's
> purported expertise narrows from "organized crime" to "this
> particular gang," from the meaning of "capo" to the
> criminality of the defendant, the officer's testimony becomes
> more central to the case, more corroborative of the fact
> witnesses, and thus more like a summary of the facts than an
> aide in understanding them. The officer expert transforms
> into the hub of the case, displacing the jury by connecting
> and combining all other testimony and physical evidence into
> a coherent, discernible, internally consistent picture of the
> defendant's guilt.
>
> In such instances, it is a little too convenient that the
> Government has found an individual who is expert on
> precisely those facts that the Government must prove to
> secure a guilty verdict—even more so when that expert
> happens to be one of the Government's own investigators.

*U.S. v. Mejia*, 545 F.3d at 190–91. The Second Circuit's repeatedly stated concerns

are consistent with broader, growing reservations in the legal community about the

improper use of expert testimony which are heightened in the context of experience-based law enforcement testimony:

> Courts face unique challenges when assessing the reliability of an expert who testifies about gang membership and tenets based only on street intelligence, gathered from years of experience. In this context, the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable. Unlike traditional expertise, there is no objectively ascertainable or empirically supportable measure of personal experience with drug jargon and no objective means of regulating or certifying gang experts. Further, there appears to be no empirical research that studies or tests the reliability of any drug jargon definitions, even though studies to ascertain whether drug jargon definitions are accurate and current could be undertaken.

*U.S. v. Holguin*, 51 F.4th 841, 867 (9th Cir. 2022) (Berzon, J., concurring in part and dissenting in part).

Because the bases for experience-based law enforcement testimony are so vague and difficult to evaluate, law enforcement witnesses may be testifying not based on some pre-existing experience or training, but rather based on their own commonsense review of the facts—usurping a task reserved for the jury and providing "expert" arguments that should be reserved for the prosecutor's summation. *See, e.g., U.S. v. Campos*, 217 F.3d 707, 719-20 (9th Cir. 2000) (Pregerson, J., concurring in part and dissenting in part). The enigmatic nature of "officer experience" as the basis for expert testimony shields it from meaningful cross-examination because any challenge to the basis or veracity of the opinion can be met with a bare, uncontestable assertion that the officer has in fact had such experience. *See U.S. v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003) (such testimony can

"impair[] the trial's truth-seeking function" because the expert "is providing an opinion that, unlike a factual matter, is not easily contradicted").

These concerns are pending in the United States Supreme Court in *Diaz v. U.S.*, No. 23-14, which was argued on Tuesday March 19, 2024. In *Diaz*, a law enforcement officer testified based on his training and experience about how drugs are packaged in Mexico and hidden in cars to be driven across the border by couriers, and how typically the couriers are aware that they are transporting drugs. By testifying about how drug organizations *usually* operate and what couriers *usually* know about what they are carrying, the agent made clear his implicit opinion that the defendant—a driver apprehended at the border who claimed not to know there were drugs in her car—in fact had knowledge of the drugs and was thus guilty. A review of the oral argument recording, *available at* [https://www.supremecourt.gov/oral_arguments/audio/2023/23-14](https://www.supremecourt.gov/oral_arguments/audio/2023/23-14), suggests that the Supreme Court is poised to limit law enforcement expert testimony about practices in the drug trade that can be used to argue that a defendant had the requisite *mens rea* to commit the crime.

## ARGUMENT

Nothing in the government's Report suggests that Mr. Hernandez's testimony will be helpful to the jury in determining whether Mr. Torres was planning to distribute the crack he was caught with or use it himself. The Report does not come close to complying with Fed. R. Crim. P. 16(a)(1)(G)(iii)'s disclosure requirements. It does not specify any reliable principles or methods. It does not cite a single peer-reviewed or empirical study (as opposed to DEA websites and secret training materials). It does not set forth a basis

for Mr. Hernandez's *ipse dixit* declarations about prices, packaging and manufacturing of narcotics. It violates the prohibition in the Federal Rules of Evidence against expert testimony "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). In short, Mr. Hernandez's testimony would do nothing more than provide the government with an extra opportunity to make its closing arguments while undermining the role of the jury in analyzing whether the evidence supports an inference that Mr. Torres intended to distribute the cocaine he was caught with. It should be excluded.

I.    **Mr. Hernandez's proposed testimony should be excluded because it violates Rule 704(b) which prohibits expert opinion "about" whether Mr. Torres intended to distribute narcotics.**

The most egregious harm posed by Mr. Hernandez's testimony contemplated by the government is that it seeks to substitute expert opinion for the function of the jury in determining the ultimate fact in issue: whether Mr. Torres *intended to distribute* narcotics. To convict on the offense charged, 21 U.S.C. § 841(a)(1), the jury must find beyond a reasonable doubt that Mr. Torres had "a specific intent to distribute" the 16 vials of cocaine in his possession. *See, e.g., U.S. v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998) (specific intent to distribute the possessed controlled substance is an element of § 841(a)(1)). But Rule 704(b) prohibits testimony about whether the defendant possessed the mental state required for conviction. Accordingly, the question here is whether Mr. Hernandez's proposed testimony is "about whether the defendant did or did not" intend to distribute the 16 vials of crack.

It is.

The reason Mr. Hernandez's testimony is relevant here is that it tends to prove or disprove a fact in issue. Fed. R. Evid. 401, 402. The issue it is relevant to is whether Mr. Torres had an intent to distribute—the required mental state to prove a violation of § 841. Thus all of Agent Hernandez's proposed testimony is necessarily "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged[,]" and precisely the sort of evidence excluded by Rule 704(b).

For these reasons, Mr. Hernandez has been precluded from providing opinion testimony in the past. In *U.S. v. Donovan*, 577 F.Supp.3d 107, 120-121 (E.D.N.Y. 2021), Judge Pamela Chen rejected the government's application to have Mr. Hernandez testify "that the cocaine and cocaine base seized in connection with [Defendant's] arrest was packaged for sale[.]" In that case, the court strictly limited Mr. Hernandez's testimony about practices in the drug trade to "general terms," and barred him from discussing evidence that had not been admitted, or opining about the meanings of specific conversations. *Id* at 121.

The government may argue that Mr. Hernandez's testimony does not run afoul of Rule 704(b) because it merely states that Mr. Torres's conduct was "*consistent* in quantity and packaging with someone who deals in narcotics, as opposed to someone who possesses narcotics for personal use," without drawing the ultimate conclusion that Mr. Torres's conduct *did* entail the requisite mental state. But, as discussed in incisive detail at the *Diaz* oral argument, such a government position is little more than a "semantic camouflage" for an opinion about *mens rea*. *See U.S. v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6162865 at *2 (S.D.N.Y. Sept. 21, 2023).

Rule 704(b) does not just prohibit explicit testimony about the requisite mental state, it also bars "stat[ing] an opinion *about whether* the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). Instead of prohibiting only an explicit opinion about the defendant's state of mind, the Rule bars expert testimony "about whether" the defendant had the mental state required to convict. *Id*. "About" means "[c]oncerning, regarding, with regard to, in reference to; in the matter of." About, Oxford English Dictionary (3d ed. 2009). Without question, Mr. Hernandez's proposed testimony—that "16 individual vials … is consistent in quantity and packaging with someone who deals", Ex. A at 2—is "about whether" Mr. Torres was using or dealing. Accordingly, it is not admissible under Rule 704(b) however styled.[1] *See generally Diaz v. U.S.*, No. 23-14, Petitioner's Merits Brief dated Dec. 27, 2023, *available at* https://www.supremecourt.gov/DocketPDF/23/23-14/294414/20231227183107134_Diaz%20Merits%20Brief%20-%20Redacted.pdf.

---

[1] The government may note that until 2011, the text of Rule 704(b), enacted by Congress in 1984, barred expert testimony "*as to* whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Pub. L. No. 98–473, § 406, 98 Stat. 1837, 2067-68 (1984) (emphasis added). In 2011, the Federal Rules of Evidence underwent a "restyling" to make them "more easily understood." Fed. R. Evid. 101 advisory committee's notes to 2011 amendment; *see also* Fed. R. Evid. 704 advisory committee's notes to 2011 amendment. The restyling included changing the phrase "as to" in Rule 704(b) to "about." But this drafting history has no bearing on the textual analysis necessary to understand he *current* statute. The focus of statutory interpretation "is the existing statutory text, and not the predecessor statutes." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). In any event, the current version is intended to be a clearer articulation of the original version, which also broadly prohibited opinion testimony concerning *mens rea.*

## II.     Mr. Hernandez's proposed testimony should be excluded because it is not based on reliable principles and methods.

Under Rule 702 of the Federal Rules of Evidence and *Daubert*, expert opinion testimony must be (1) "based on sufficient facts or data, (2) "the product of reliable principles and methods," and (3) reflect "a reliable application of the principles and methods to the facts of the case." The mere fact that the testimony is given by a law enforcement witness does not excuse the government from demonstrating the testimony is based on sufficient facts and data, the product of reliable principles and methods, and a reliable application of those principles and methods to the facts of the case. *U.S. v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (reversing conviction). "[T]he Federal Rules of Evidence and the Supreme Court place the responsibility upon the district courts to avoid falling into error by being vigilant gatekeepers of such expert testimony to ensure that it is reliable and not substantially more unfairly prejudicial than probative." *U.S. v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003).

Here, the government describes Mr. Hernandez's "methodology" in a single long sentence at the bottom of page one of the Report:

> Inspector Hernandez's testimony will be based on his training, education, and experience, including his 37 years as a law enforcement officer primarily involved in investigating narcotics trafficking, which includes his personal involvement in the execution of search warrants and arrest warrants, where he has recovered narcotics, debriefing of defendants, witnesses, and confidential sources involved in manufacturing and distributing narcotics in the New York City area, his attendance of trainings presented by the DEA and the High Intensity Drug Trafficking Areas (HIDTA) program, as well as his consultation of resources such as the El Paso Intelligence Center (EPIC), DEA intelligence reports (both public reports and training materials provided to DEA

agents), and the 2022 to 2023 version of the Drug
Identification Bible. *See, e.g.,* https://www.dea.gov/sites/
default/files/2022-12/DEA-OPCK_FactSheet_
December_2022.pdf; https://www.dea.gov/sites/
default/files/2020-06/Cocaine-2020_1.pdf;
https://www.dea.gov/factsheets/cocaine; https://www.
dea.gov/sites/default/files/2023- 04/Benzodiazepines
%202022%20Drug%20Fact%20Sheet_1.pdf.

This puzzling sentence—benzodiazepines and fake pills are not in issue in this case
and the other two links lead to dead ends—is tantamount to a government admission that
Mr. Hernandez *has no sources or methods* and his testimony is, therefore, unreliable. He
claims to have participated in searches, arrests and debriefings in his long law enforcement
career, but he does not state when those took place or what information was garnered
from them. Trends in drug packaging and street pricing change day to day. There very
well may be studies that keep up with the latest trends that could be helpful to the jury
but none are cited and there is no evidence that Mr. Hernandez is even aware of them, let
alone qualified to discuss them.

### 1.    Agent Hernandez's comments about cocaine distribution practices are unsupported.

To take specific examples from the Report—and these are merely examples because
the whole document is objectionable—Mr. Hernandez would like to testify that "cocaine
is typically sold in baggies that are priced at $20 each, and crack cocaine is often sold in
baggies or vials that are priced at $10 each." Ex. A at 2. Those are concrete data points
that should be backed up by a source: no amount of "training and experience" can qualify
and expert to testify about today's stock market price. So here, survey data, records of

sales, or some other empirical, testable observations must be required to permit such testimony.

Mr. Hernandez's "application" of his non-methodology to the facts of this case amounts to rank explanation, perhaps permissible by the government in summation but miles away from actual methods used by actual subject-matter experts. *See* Ex. A at 2. He does not specify how he calculated the vials found on Mr. Torres to be worth $10 each retail or how he knows that "a gram of crack cocaine in New York…would cost approximately $35, and would not be divided into multiple vials." *Id*. He could have studied the matter, pointed to surveys or similar seizures, or even to statements by buyers or sellers. He does none of these and his testimony, far from being expert testimony, amounts to nothing more than speculation.[2]

> ### 2. Agent Hernandez's analysis of messages on Mr. Torres's phone is not based on facts, data, principles or methods.

Similarly, Agent Hernandez's proposed testimony interpreting conversations on Mr. Torres's seized phone is inadmissible under Rule 702 because it is not based on facts, data, or an established methodology. While law enforcement testimony may in some circumstances identify and translate coded language, such testimony must be shown to be reliable. Gatekeeping in this realm is difficult because "there is no objectively ascertainable or empirically supportable measure of personal experience with drug jargon and no objective means of regulating or certifying gang experts. Further, there appears to be no empirical research that studies or tests the reliability of any drug jargon definitions, even

---

[2] Imagine, for a moment, if an economist submitted a similarly-sourced report to determine damages or pricing in a civil case. They would be laughed out of court.

though studies to ascertain whether drug jargon definitions are accurate and current could be undertaken." *U.S. v. Holguin*, 51 F.4th 841, 867 (9th Cir. 2022). The Report certainly cites none.

Here, Mr. Hernandez does not even propose to translate specific words or codes based on his knowledge of drug talk; rather his testimony would analyze the series of messages to determine Mr. Torres's state of mind. Ex. A at 2 ("the conversation is consistent with a discussion regarding the sale of re-distribution quantities of cocaine"). That's not allowed under the Rules and case law outlined above. Faced with precisely the same question in *Donovan*, Judge Chen concluded that:

> Inspector Hernandez may describe "the significance of language and physical evidence [only] in the abstract," and he may "dr[a]w no specific conclusions about the significance of that conduct or of the language in this particular case." *See [U.S. v. Willis*, 14 F.4th 170, 186 (2d Cir. 2021)]. Further, as noted, Inspector Hernandez may not discuss evidence that has not been admitted, such as evidence related to uncharged transactions. Nor may Inspector Hernandez "testify about the meaning of conversations in general, beyond the interpretation of code words" or "interpret ambiguous slang terms based on knowledge gained through involvement in the case, rather than by reference to the fixed meaning of those terms."

*U.S. v. Donovan*, 577 F.Supp.3d 107, 121-22 (E.D.N.Y. 2021).

Given the expert disclosure, if the Court follows Judge Chen's approach there is nothing left for Mr. Hernandez to say about Mr. Torres's phone conversations, because he does not purport to translate coded language or slang that the jury might not be familiar with. And that's appropriate. The messages are in English and use everyday slang familiar to most New Yorkers (for example, everyone knows "a buck" can mean $100 and "10 g."

can mean ten grams—you don't have to take a special course to learn that). What the government wants to do is use Mr. Hernandez to make their closing argument, cloaked in long expertise, and replacing the jury's own analysis of the evidence. The expert rules do not allow that.

### III. Mr. Hernandez's proposed opinion testimony should be excluded because it is based on commonsense inference, not specialized knowledge or experience.

A careful reading of the Report reveals no proposed testimony that is outside the everyday experience of the typical Southern District of New York juror. "[E]xpert testimony on drug related matters is unnecessary and properly excludable where all the primary facts can be accurately and intelligibly described to the jury, and if they, as persons of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation." *U.S. v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991). Expert testimony addressing "lay matters which a jury is capable of understanding without expert help" is not relevant and therefore not admissible. *U.S. v. Ulbricht*, 14 Cr. 68, 2015 WL 413318 at *8 (S.D.N.Y. Feb. 1, 2015), *citing U.S. v. Jiau¸* 734 F.3d 147, 154 (2d Cir. 2013). Here, a jury is perfectly capable of gleaning on its own that a photo of a scale with powder on it might be drugs being weighed, that a chart converting grams to ounces might be used for measuring drugs, or that a drug dealer might carry a gun. *See e.g. U.S. v. Reddick*, 284 F.Supp.3d 159, 163-164 (D. Conn. 2018) ("Agent Zuk may not testify about the use of guns as a tool of the trade for drug dealing, the Government is free to argue during closing statements the common

sense reasons why someone who is engaged in unlawful narcotics trafficking may decide to possess a firearm for protection."). While certain testimony from Mr. Hernandez might be outside the ken of a juror, like how to cook crack, none of that specialized testimony is relevant to any fact in issue. Accordingly, Mr. Hernandez's proposed testimony should be rejected.

## IV. Mr. Hernandez's proposed testimony should be excluded because the expert disclosure was deficient.

The recently-amended Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure requires the government to submit "a *complete* statement of *all opinions* that the government will elicit from" its expert and the "bases and reasons for" each of the opinions. Fed. R. Crim. P. 16(a)(1)(G)(iii) (emphasis added). *See U.S. v. Mrabet*, 23 Cr. 69 (JSR), 2023 WL 8179685 at *1-2 (S.D.N.Y. Nov. 27, 2003) (highlighting the former version of the rule, which merely required a "written summary," and noting that the prior SDNY practice of merely providing a criminal defendant with a brief "summary" of a prosecution expert's opinions was "woefully inadequate"). In this case, the government's Report, described in detail above, does not come close to complying with Rule 16(a)(1)(G)(iii).

As to the numbered points on page one, number one through five, eight and nine merely highlight topic areas. They fail to provide a statement of opinions or the bases or reasons for those opinions. *See* Ex. A at 1. The remaining points do state opinions in conclusory form, but they fail to specify any basis or reason for those opinions.

By way of example, Mr. Hernandez would like to advise the jury that "drug users have narcotics on their person, they also often have paraphernalia consistent with the use of those types of narcotics, including, for example for crack cocaine, a crack pipe." Ex. A

at 1. While that commonsense notion may be true (and may be a conclusion drawn by a finder of fact without any expert assistance), it is not a conclusion based on Mr. Hernandez's study, training or expertise as a law enforcement officer. It is not based on a study. Mr. Hernandez does not indicate he has ever arrested a drug *user* as opposed to a drug trafficker. He does not indicate what percentage of drug users carry crack pipes. This point is an argument that the government can make in closing, but cloaking Mr. Hernandez in the guise of an expert to testify about it would serve only to usurp the role of the factfinder.

The same logic applies to the remaining assertions. You do not need an expert to know that most illegal drugs are bought with cash (point seven) or that drug dealers sometimes carry guns (point ten). Mr. Hernandez's proposed testimony was not properly disclosed and, where disclosed, would not be helpful to the jury. It should therefore not be received in evidence.

V.     **Even if admissible under the expert rules, Mr. Hernandez's testimony should be excluded because its minimal probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and or needlessly presenting cumulative evidence.**

Finally, much of Mr. Hernandez's proposed testimony should be rejected because it is irrelevant and therefore inadmissible under Fed. R. Evid. 401 and 402. For example, what difference does it make how "powder cocaine is cooked into crack cocaine" or how people *other than* Mr. Torres and unconnected in any way to Mr. Torres package and price drugs *other than* crack? *See* Ex. 1 at 1.

The rest of the proposed testimony offers minimal probative value but would confuse the issues, unfairly prejudice the jury against Mr. Torres, and needlessly present

cumulative evidence regarding drugs. The jury might be misled to believe that Mr. Hernandez has special knowledge of other drug dealers who must be associated with Mr. Torres because he is testifying at Mr. Torres's trial. The trial on this issue should be brief, but it appears that the government seeks to extend it by rehashing the evidence seized form Mr. Torres during Mr. Hernandez's testimony and having Mr. Hernandez testify regarding the facts of the case. "When a law enforcement official testifies about the facts of a case and offers expert opinions, 'a juror understandably will find it difficult to navigate the tangled thicket of expert and factual testimony from the single witness, thus impairing the juror's ability to evaluate credibility.'" *See U.S. v. Cruz*, 363 F.3d 187, 195 (2004). The government will have plenty of time to make Mr. Hernandez's arguments in summation; and given the negligible probative value of his testimony, time should not be wasted on it. *See U.S. v. Cruz*, 363 F.3d at 194 (2d Cir. 2004); *U.S. v. Castillo*, 924 F.2d 1227, 1236, f.n. 9 (2d Cir. 1991) (even if admissible under Rule 702, expert testimony is still subject to exclusion under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice). *U.S. v. Jobin*, 327 F.Supp.2d 310, 315 (D. Vt. 2004) (excluding law enforcement expert testimony regarding a witness's knowledge as "very prejudicial" under Rule 403); *U.S. v. Reddick*, 284 F.Supp.3d 159, 163 (D. Conn. 2018) ("made-to-order" expert testimony by law enforcement officer who reviewed the evidence in the case excludable under Fed. R. Evid. 403 because of risk of unfair prejudice).

## <u>CONCLUSION</u>

For the reasons set forth above, Agent Hernandez should not be permitted to testify

as an expert at trial.

Dated:      March 22, 2024
            New York, New York


Respectfully submitted,
ZMO Law PLLC

By:  *Zachary Margulis-Ohnuma*
            Zachary Margulis-Ohnuma
            Tess M. Cohen
            353 Lexington Avenue, Suite 900
            New York, NY 10016
            (212) 685-0999